Argued and submitted April 3; taken In Banc September 4, affirmed
November 26, 1997

In the Matter of the Marriage of

Miley L. KEMPKE,
nka Purkerson,
*Respondent,*

*and*

Ben A. KEMPKE,
*Appellant.*

(95DO1408DS; CA A94110)

949 P2d 1239

Douglas J. Richmond argued the cause for appellant. With him on the brief was Kellington, Krack, Richmond & Blackhurst.

Miley L. Purkerson, *pro se*, waived appearance.

LEESON, J.

Landau, J., dissenting.

## LEESON, J.

Father appeals from a judgment modifying his divorce decree and increasing his child support obligation. ORS 25.287.[1] He assigns error to the trial court's denial of his motion to terminate his child support obligation because mother has unreasonably denied him visitation of their child. ORS 107.431(1). We review *de novo*, ORS 19.125(3), and affirm.

Mother and father were divorced on May 22, 1992, and mother was awarded custody of their minor child, who then was three months old. For the first three months of the child's life, father had unlimited visitation rights at either mother's residence or another mutually agreed upon location. Upon dissolution, the parties were ordered to participate in mediation to establish a subsequent visitation schedule.[2] From the birth of the child until August 23, 1993, father attempted to visit his child 30 to 40 times, but was denied visitation. Each time father attempted to exercise his visitation rights, mother filed a stalking complaint against him, none of which was prosecuted. On August 23, 1993, father moved for, and the trial court granted, an order to show cause why visitation should not be modified. Mother did not appear, and the court modified the visitation schedule for father, granting him visitation on every other weekend and on certain holidays. Father attempted visitation as specified in the August 23, 1993, order seven times, but mother denied him visitation each time.

On February 21, 1996, the State of Oregon, on behalf of mother, moved to modify father's support obligation from $258 per month to $392 per month.[3] In response, father filed

---

[1] Pursuant to ORS 25.080, the State of Oregon was a party to this proceeding because it initiated the modification of child support under ORS 25.287. However, the state did not receive notice of the appeal and is not a party in this appeal.

[2] The parties did not attend mediation and, on March 16, 1993, the court again ordered the parties to mediation. On the advice of the mediator, no mediation occurred. Mediation was ordered again in May 1996, and mother failed to attend.

[3] In support of its motion to modify, the Support Enforcement Division (SED) submitted a support worksheet computation that listed father's adjusted gross monthly income as $2,810 and mother's as $910. Father's percentage share of income and of total child support obligation is 76 percent. The total amount required to support the child is calculated at $516. Father's proportional share is $392.

an affidavit and motion to terminate child support under ORS 107.431(1). That statute provides:

"At any time after a decree of annulment or dissolution of a marriage or a separation is granted, the court may set aside, alter or modify so much of the decree relating to visitation of a minor child as it deems just and proper or *may terminate or modify that part of the order or decree requiring payment of money for the support of the minor child with whom visitation is being denied* after:

"(a)  Motion to set aside, alter or modify is made by the parent having visitation rights;

"(b)  Service of notice on the parent or other person having custody of the minor child is made in the manner provided by law for service of a summons;

"(c)  Service of notice on the administrator of the Support Enforcement Division of the Department of Justice when aid, as defined in ORS 418.035(2), is being granted to or on behalf of any dependent child of the parties. As an alternative to the service of notice on the administrator, service may be made upon the branch office of the division which provides service to the county in which the motion was filed. Service may be accomplished by personal delivery or first class mail; and

"(d)  A showing that the parent or other person having custody of the child or a person acting in that parent or other person's behalf has interfered with or denied without good cause the exercise of the parent's visitation rights."

(Emphasis supplied.) Both parties appeared *pro se* at the show cause hearing. At that hearing, father made an opening statement followed by mother's opening statement. During her statement, mother informed the court that on one occasion she asked father whether he wanted to see the child and father stated: " 'No, I don't want to have anything to do with that child. I don't want to pay child support.' " Mother also stated that father never attempted to see their child and that when she offered to let father see him, he refused to do so. Mother argued that, under the terms of the judgment, father had no visitation rights. When the court attempted to explain that the original dissolution judgment had been modified to allow father visitation, mother disagreed. The trial court

warned mother to control herself in the courtroom and following a short colloquy with the court, mother declared that she was unwilling to participate in the proceeding and departed.

After mother departed, father presented evidence of mother's denial of his visitation rights. He testified:

> "It wasn't my choosing that it would be this way. But, you know, any visitation, it's not going to work. And there's got to be something that can happen. You know, I don't feel that it's right that I need to pay my [support] every month like I have been for the last four years and have her tell me that I'm never going to get a visitation and the child is four years old now and I still haven't gotten any visitation and it's never going to happen. It hasn't yet. I'm sure it's not going to."

In his closing argument, father argued:

> "I don't feel that it's right that I pay my support and never be allowed visitation and it's never going to be right in the future. I mean no matter how hard I try, it's never going to work out with her and she's never going to allow me to see that child.
>
> "I feel it's in the best interests, you know, she take her child and raise it or do what she needs to do and, for myself, that I don't have to pay any [support] for something that I'm not getting any right to."

The court made the following findings:

> "I * * * find that during the period of time since the entry of the decree of dissolution of marriage, including the modification, which provides more specific visitation[,] [t]hat [father] has been continuously denied visitation and has made reasonable efforts to do so and that any lack of continual efforts on a regular basis would be appropriate given her, * * * [wife's], activities in calling the police.
>
> "I'll tell you what my problem is based on those facts, [father], is that at some point this child has an interest in the proceeding and although the child is not a party, the unfortunate aspect of it is that while you're being punished, the person being punished the most is the child * * *."

The trial court denied father's motion to terminate child support and ordered that father pay $392 per month until the child reaches the age of 18 years or ceases to be a "child

attending school" under ORS 107.108(4). The court also ordered that the payment "shall *not* be paid to [mother], but instead shall be paid to a bank account, in the name of [father], as trustee for the benefit of the minor child." (Emphasis in original.) The trial court offered the following explanation:

> "I'll tell you what I'm not going to do in this proceeding \* \* \* is *I'm not going to bastardize your child.* She may be attempting to do that but I'm not going to participate in it. I take notice of the fact of your ex-wife's attitude here in this proceeding, [her] inability to control herself and her willingness to absent herself from this proceeding, which evidences to me that she knows she's clearly wrong and when backed up against the wall, she can't deal with it, but some day that child is going to come looking for you and some day that child is still going to be your child and at that point, then, there will be something there for the child from you and you can demonstrate for your own conscience and obligation to that child that you have provided for that child for all those years and *to the extent that this does not induce her to take some different action to provide you visitation, then, in fact, you can come back to court after a reasonable period of years and seek further modification but I am not willing and I'm not aware of any Judge that's necessarily going to be willing to simply terminate your obligation based upon her actions absent further efforts by you to enforce your rights through contempt proceedings and through, in fact, petitions to change custody because at some point—you may have reached that point, you may not—I'm not going to predispose myself or anybody else to that but at some point that's appropriate.*[4]
>
> "And I recognize your concern and I recognize the limitations you face with regard to the nature of your employment but, in fact, you know, this child is four years old and I would encourage you not to give up because I'm not going to give you this as an excuse to give up. You still have a child and you still have obligations to that child. I'm not going to give her the money at this point but I am going to provide that you have a continued obligation to that child."

---

[4] Unlike the dissent, 151 Or App at 443, we do not read the emphasized portion of the trial court's statement as containing a requirement that father bring a contempt of court or change of custody proceeding before he is entitled to have his child support obligation terminated under ORS 107.431(1).

(Emphasis supplied.)

Father assigns error to the trial court's failure to terminate his child support obligation under ORS 107.431(1), arguing that because mother unreasonably denied him visitation, he was entitled to termination of his support obligation. Mother neither filed a responding brief nor appeared at oral argument.

In circumstances such as those presented here, ORS 107.431(1) provides that a court may terminate or modify a child support award. In this case, the trial court refused to terminate the child support and ordered father to pay the money into a trust fund in an effort to induce mother to allow him visitation. Father did not challenge the trial court's authority to create the trust fund below, nor does he on appeal. The only question is whether, under ORS 107.431(1), father's child support obligation should be terminated.

The trial court observed both parties, heard their conflicting statements and assessed their credibility before ruling.[5] On *de novo* review, we exercise our own judgment on the facts before us, but we give deference to the trial court's assessment of credibility. We substitute our judgment for the trial court's judgment only if we have principled reasons to do so. *Haguewood and Haguewood*, 292 Or 197, 202, 638 P2d 1135 (1981). In this case, we decline to substitute our judgment for the trial court's.

Father's argument reduces to the assertion that he is entitled to have his child support obligation terminated under ORS 107.431(1) because mother has consistently denied visitation without good cause. We disagree. Applying the methodology of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), we note that nothing in the text of ORS 107.431(1) mandates that child support be terminated on facts such as these. The statute unambiguously provides that the court "*may* terminate or modify." Nothing in the plain language of the statute declares that it was intended to entitle noncustodial parents to escape their

---

[5] The dissent contends that the trial court made no credibility findings. 151 Or App at 444. It is difficult to read the trial court's explanation to father, quoted above, without concluding that it assessed the parties' credibility.

child support obligations. Rather, the context shows that ORS 107.431(1) was intended to be a tool in resolving visitation disputes.[6] It is the public policy of this state "to encourage parents to share in the rights and responsibilities of raising their children after the parents have separated or dissolved their marriage." ORS 107.149. Consistent with that policy, we have held that "support obligations are for the benefit of the dependent child, not the parent." *State ex rel Juv. Court of Louisiana v. McIntyre,* 97 Or App 56, 59, 775 P2d 329 (1989). Construing ORS 107.431(1) as father asks us to would undermine public policy regarding both child support and visitation.

Based on the record before us, we agree with the trial court that terminating father's child support obligation at this point would be tantamount to terminating father's parental relationship with his son. That result is contrary to public policy and with the intentions of ORS 107.431(1). The trial court explained to father that if its order "does not induce [mother] to take some different action to provide you visitation, then, in fact, you can come back to court after a reasonable period of years and seek further modification * * *." We agree. Under the circumstances presented on this record, father is not entitled to have his child support obligation terminated under ORS 107.431(1).

Affirmed.

---

[6] Although not necessary to our analysis in this case, we note that the legislative history supports our conclusion. That history establishes that the goal of House Bill 3061, which became ORS 107.431(1), was to give judges another tool, in addition to contempt and change of custody, to assure that noncustodial parents get to see their children. Representative Sumner, the sponsor of HB 3061, explained that parties who are denied visitation rights are not interested in getting out of making support payments, they are interested in seeing their children. Minutes, House Committee on Judiciary, May 11, 1977, p 2. Lee Cunningham, representing the Association of Divorced Men, stated that "visitation is more serious than the support issue." *Id.* Representative Sumner emphasized that a feature of the bill was that "if there is interference and denial of parents' visitation rights, the court may modify." Minutes, Senate Committee on the Judiciary, June 28, 1977, p 6. Senator Kafoury agreed that "something should be done in this area, not necessarily cutting off payments." *Id.* at p 7. Senator Cook stated that, as he understood the bill, "there was discretion on the part of the judge." Minutes, Senate Committee on the Judiciary, July 2, 1977, p 5. The legislature gave judges discretion in deciding how best to use those tools to achieve the goal of visitation.

**LANDAU, J.,** dissenting.

ORS 107.431(1) provides that, upon a showing that the custodial parent "has interfered with or denied without good cause the exercise of the [noncustodial] parent's visitation rights," the court may "terminate or modify" the child support. In this case, mother has repeatedly—upwards of 40 times—interfered with father's visitation rights completely and without cause. In my view, the statute was intended to address cases such as this one. I respectfully dissent, therefore, from the majority's decision to the contrary.

That mother unreasonably and repeatedly denied father visitation in this case is beyond dispute. As father explained:

"It started off when the child was born. Shortly before the child was born, I got a letter—I don't have that with me today—but the letter went to my mom's house where I was staying at the time and it said that if I showed up at the hospital when she was having this baby or had anything to do with it that I'd be arrested and thrown out of the hospital. This is my child being born so I showed up at the hospital the day that he was born and subsequently they took the baby and ran down the hall and I did nothing but stand there and the nurses came back and they took a look at my paperwork and apologized to me for ever having done that but there again it was the start of the attempts that were denied me.

"Since that time I've went to her residence, I would say, probably thirty or forty times minimum at the exact dates and times that I should be there and was always denied visitation. I would walk up, knock on the door. As soon as I knocked on the door—she's got a bad temper. I'd knock on her door and she'd say, 'Who is it?'

"And I'd say, 'Well, it's me. I'm here for my visitation.'

"She'd tell me that's off.

"And I would say, 'Okay, I'm documenting that I tried.' That's all I would say. I would walk down and get in my car and drive off. This happened probably thirty times. Well, each time I tried to do that, she would file a stalking complaint against me with the city police department. * * *

"* * * * *

"[T]he entire time that we've been separated, it has been a constant thing. Every single time I go to get visitation, she turns me into the police, she calls in a stalking complaint. Every one of these complaints have been investigated and found to be unfounded, which they are. It even went so far as she couldn't get any results out of the city police department that she went to the Sheriff's Office and they did their investigations and whatever they needed to and that didn't work for her, so she went to the State Police Department. They put an investigator on the case, Dean Perske. He's investigated every single allegation since the start of our time that we were separated and every one of those turned out to be a false thing."

The trial court found, on the basis of father's unrebutted testimony, that mother did unreasonably interfere with visitation. The court concluded, however, that father could not avail himself of the remedies afforded under ORS 107.431(1) without first bringing contempt and change of custody proceedings:

"I am not willing and I'm not aware of any Judge that's necessarily going to be willing to simply terminate your obligation based upon her actions absent further efforts by you to enforce your rights through contempt proceedings and through, in fact, petitions to change custody * * *."

In my view, the trial court clearly was wrong. The statute does not require that. To the contrary, it plainly states that "[a] showing that the [custodial] parent * * * interfered with or denied without good cause the exercise of the parent's visitation rights" is sufficient to warrant modification or termination of child support. I would reverse and remand on that basis alone.

The majority does not address the trial court's error in reading into the statute conditions that do not appear in the text. It nevertheless affirms the judgment for two reasons, neither of which I find persuasive.

First, the majority contends:

> "The trial court observed both parties, heard their conflicting statements and assessed their credibility before ruling. On *de novo* review, we exercise our own judgment on the facts before us, but we give deference to the trial court's assessment of credibility. We substitute our judgment for the trial court's judgment only if we have principled reasons to do so. In this case, we decline to substitute our judgment for the trial court's."

151 Or App at 440 (citation omitted). The majority's statement of the law certainly is without flaw. But its application of the law to this case is incorrect. The trial court did not "observe[ ] both parties, hear[ ] their conflicting statements and assess[ ] their credibility." Mother never testified. She was invited to do so, but she walked out of the hearing in the middle of her opening statement. Father did testify. And, on the basis of that testimony, the trial court found that mother unreasonably withheld visitation. It made no credibility findings. There is nothing to which we should defer in this case.

Second, the majority states that ORS 107.431(1)

> "unambiguously provides that the court '*may* terminate or modify [child support].' Nothing in the plain language of the statute declares that it was intended to entitle noncustodial parents to escape their child support obligations. Rather, the context shows that ORS 107.431(1) was intended to be a tool in resolving visitation disputes."

151 Or App at 440-41 (emphasis in original). Of course, the majority is correct in asserting that the statute does not *require* termination of child support. The statute does say, however, that "[a] showing that the [custodial] parent * * * interfered with or denied without good cause the exercise of the [noncustodial] parent's visitation rights" is sufficient—at least in some cases—to warrant termination or modification of support. The question, then, is why in this case, in which mother *never* has allowed father to see his child, the statutory remedy does not apply.

The majority responds to that question by asserting that to apply the statute merely upon proof of unreasonable interference with visitation is contrary to the policy that child support is intended to benefit the child and not the custodial

parent. I respectfully suggest that the majority's concerns in that regard are addressed more appropriately to the legislature, which—rightly or wrongly—has made the policy decision to allow the termination of child support to be used as a means of enforcing visitation rights. In any event, under the facts of this case, in which the child support will be paid into a trust fund—and not to the child or his mother—for another 13 years, the majority's observation is beside the point.

In short, father has demonstrated that mother has interfered with visitation without just cause. Pursuant to ORS 107.431(1), on *de novo* review, I would reverse the trial court and remand for entry of a judgment terminating child support.

Warren and Riggs, JJ., join in this dissent.